UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PAIGE LAINE KHYEL TAYLOR

                Plaintiff,

v.

                                                  Case No. 8:20-cv-687-T-36SPF

DEPUTY WAYNE WAGNER; and
SHERIFF BOB GUALTIERI,
In his official capacity as
Sheriff of Pinellas County;
                Defendants.
_____

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT, SHERIFF GUALTIERI, MOTION FOR SUMMARY JUDGMENT**

**COMES NOW** the Plaintiff, PAIGE LAINE KHYEL TAYLOR, by and through the undersigned Counsel, and in response in opposition to Defendant, SHERIFF GUALTIERI's, Motion for Summary Judgment (Doc 55) and would respectfully state as follows:

**I.   STANDARD OF REVIEW**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jones v. City of Columbus, Ga.*, 120 F.3d 248, 251 (11th Cir. 1997); citing Fed.R.Civ.P. 56(c). Sheriff Gualtieri carries the burden of establishing the absence of a genuine issue of material fact. *Jones* at 251; citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In ruling on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (U.S. 2014); citing

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 255, (1986). The "judge's function" at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (U.S. 2014); citing *Anderson*, 477 U. S., at 249. The Defendant's own motion establishes clearly there are genuine issues for trial.

Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151 (11th Cir. 2012) Reasonable inferences are inferences reasonably drawn from all facts then before the Court, after sifting through the universe of all possible inferences the facts could support. *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999). Reasonable inferences are not necessarily more probable or likely than other inferences that might tilt in the moving party's favor. *Id.* Instead, so long as more than one reasonable inference can be drawn, and that inference creates a genuine issue of material fact, *the jury is entitled to decide* which inference to believe and summary judgment is not appropriate. *Id.* Here, a reasonable inference can be made that Officer Wagner did not act with bad faith or malice when taking Plaintiff into custody. A review of the video establishes a clear jury question.

## II. STATE LAW CLAIMS AGAINST SHERIFF SHOULD NOT BE DISMISSED BECAUSE ALTERNATIVE PLEADING ARE PERMITTED

Fla. Stat. Section 768.28 provides sovereign immunity to the state when an employee acts outside the scope of their employment, in bad faith, or with malice or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. Conversely, the statute provides immunity to a state officer or employee who is acting within the scope of their employment and without malice. As the Florida Supreme Court has explained, "in any given situation either the

agency can be held liable under Florida law, or the employee, but not both." *McGhee v. Volusia County*, 679 So. 2d 729, 733 (Fla. 1996). But while only the agency or employee can be held liable, Federal Rule of Civil Procedure 8(d)(2) allows a plaintiff to plead claims in the alternative (*i.e.*, alleging malice on the part of the employee in a count against the employee, and then alleging absence of malice in another count against the agency). *Garayoa v. Reina*, 16–20213–CIV, 2016 WL 3348536, at *2 (S.D. Fla. June 16, 2016) (explaining, "the 'nature of Florida Statutes § 768.28 tends to require a plaintiff to plead alternative and inconsistent claims against a government entity and its employees.'"). *Ullman v. Fla. Dep't of Corr.*, No. 5:17-CV-66-OC-30PRL, 2017 WL 2103392, at *2 (M.D. Fla. May 15, 2017) See *Bing v. Landreville*, No. 3:16-CV-1140-J-34JRK, 2018 WL 1121610, at *9 (M.D. Fla. Mar. 1, 2018) (the Court rejected the City's argument that the wrongful death claim against the City should be dismissed because Plaintiff pled the Officer acted "brutally and maliciously," and therefore the City is immune from suit pursuant to section 768.28(9)(a). The Court reasoned the Plaintiff is permitted under the alternative pleading rules to plead both that the Officer may be liable for malicious behavior, and in the alternative, that the City is liable for the Officer's actions if he acted wrongfully committing an intentional tort.) See e.g., *Gregory*, 2017 WL 5483158 at *12; *Bickel*, 2017 WL 2439078 at *4; *Ullman*, 2017 WL 2103392 at *2 n.2; *Claridy*, 2014 WL 12656531 at *2; *Hargis*, 2012 WL 6089715 at *6 n.12; *Petithomme*, 2011 WL 3648622 at *3 n.2; *Ashley*, 2011 WL 3236051 at *3; *Peguero*, 2011 WL 13223704 at *1; *Hair*, 2008 WL 2690793 at *1; *Searer*, 837 F. Supp. at 1202.

Here, a reasonable jury could find either way (with malice or without), and therefore it is a jury question. The jury can alternatively deliberate based on the evidence that comes out at trial.

In a case in which it is reasonable to sue just the officer or just the sheriff, it is also reasonable to have the jury consider both.

Plaintiff's response analyzes each tort separately, beginning with State Law Battery.

## STATE LAW BATTERY AGAINST SHERIFF SHOULD NOT BE DISMISSED

Florida sovereign immunity does not bar all suits based on excessive force or battery by a police officer because those intentional torts "do not inherently or necessarily involve those elements [—bad faith, malicious purpose, or wanton and willful disregard of human rights—] which would activate immunity." *Richardson v. City of Pompano Beach*, 511 So.2d 1121, 1124 (4th DCA 1987). As explained by another Florida appellate court addressing battery claims against a city for an officer's use of excessive force: "While battery is an intentional tort, the City may be held liable for an employee's intentional act(s) as long as the employee is acting within the course and scope of his employment and the act or omission is not committed in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of the plaintiff's rights." *City of Boynton Beach v. Weiss*, 120 So.3d 606, 611 (Fla. Dist. Ct. App. 2013); see *McGhee v. Volusia Cnty.*, 679 So.2d 729 (Fla. 1996) (rejecting the argument that a police officer who lunged at a defendant in custody, grabbed him by the throat, and kicked him was, as a matter of law, acting outside the scope of his employment or in a willful and wanton manner); *Carestio v. Sch. Bd. of Broward Cnty.*, 866 So.2d 754 (Fla. Dist. Ct. App. 2004) (concluding that school employees who kicked and punched a student after removing him from class for disruptive behavior were within the scope of employment, and directing the factfinder the determine whether the employees were acting in a willful and wanton manner).

In *Mazzilli v. Doud,* 485 So. 2d 477 (Fla. 3d DCA 1986), the court addressed a battery claim against a law enforcement officer. In the law enforcement context, battery requires a showing that

the officer did not reasonably believe that his use of force was necessary. *Id*. at 479.

In *Prieto v. Malgor*, 361 F. 3d 1313 (11th Cir. 2004), the Eleventh Circuit, evaluating a battery claim against two Florida police officers, noted approvingly that the jury was instructed that "battery meant 'the officers used force which exceeded that which was reasonably necessary under the circumstances to carry out his or their duties.'" *Id*. at 1320, *quoting* jury instruction.

In *Gomez v. Lozano*, 839 F. Supp. 2d 1309 (S.D. Fla. 2012), the court noted similarly that Florida law defines battery as the "intentional infliction of a harmful or offensive contact upon the person of another." *Id*. at 1322. Because police officers "receive a presumption of good faith in Florida," the court continued, "they are liable for battery only if they use excessive force when making a lawful arrest." *Id.* Finally, "A battery claim for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances." *Id.*

In *McGhee v. Volusia County*, 679 So. 2d 729 (Fla. 1996), the Florida Supreme Court addressed a claim of a handcuffed arrestee, that, during booking procedures, a Sheriff's deputy "lunged at McGhee, grabbed him by the throat, and began kicking McGhee by force." *Id*. at 730. The issue for the *McGhee* court was whether the allegations against the deputy reflected bad faith, malicious purpose, or wanton and willful disregard of human rights. *Id*. The court noted that, "The employing agency is immune as a matter of law [under 768.28(9)] only if the acts are *so extreme* as to constitute a clearly unlawful usurpation of authority the deputy does not rightfully possess, …, or if there is *not even a pretense* of lawful right in the performance of the acts." *Id.* at 733, *citing Craft v. John Sirounis & Sons, Inc.* 575 So.2d 795 (Fla. 4th DCA 1991) (emphasis added). Still, the *McGhee* court found that the deputy's acts did not constitute a clearly unlawful usurpation of authority. *Id.* at 733. *McGhee* noted further that "[t]he fact that [the officer] may

have intentionally abused his office does not in itself shield the Sheriff from liability. In sum, the question must be put to the factfinder whether [the officer] acted in bad faith, with malicious purpose, or in a manner exhibiting wanton or willful disregard of human rights, safety, or property." *Id.* In an accompanying footnote, the *McGhee* court made clear that, "There may be cases in which summary dismissal would be proper based on different facts." *Id.* at 733, n. 7. Ultimately, the Florida Supreme Court in *McGhee* concluded that a deputy's conduct in lunging at a handcuffed arrestee, grabbing him by the throat, and then forcibly kicking him did not, by itself, preclude liability of a sheriff under the standards of § 768.28(9)(a), *Fla. Stat*.

In *Thompson v. Douds*, 852 So. 2d 299 (Fla. 2nd DCA 2003), the Appellate Court reversed the trial court's order granting summary judgment in an action that included claims of battery against several police officers. *Id*. at 302. In *Thompson*, the plaintiff, Magyar, who suffered from confusion and complaining of some health issues, was encountered by Officer Mazza. *Id.* Mazza permitted him to sit on a curb at an abandoned gas station to await an ambulance. *Id.* As they waited, Sergeant Drees arrived. *Id*. Magyar, acting oddly, then began to walk away, ignoring the officers' commands to stop. *Id.* Mazza and Drees chased him down and grabbed his arms. *Id*. Magyar told the officers that he had done nothing wrong and simply wanted to go home, three blocks away. *Id.* at 302 & n. 1.

Drees then began performing "leg sweeps" to force Magyar to the ground. *Id*. He eventually fell to his hands and knees, and Drees and Mazza, continuing to struggle, forced Magyar face down on the ground. *Id.* Both Drees and Mazza were on top of Magyar, using their body weight to hold him down as they awaited backup. *Id*. at 302-03. As backup officers arrived, Drees "told the backup officers as they approached that they were not to hurt Magyar because they were only trying to get him to the hospital." *Id.* at 309. Officer Gomez arrived, and lay across Magyar's

legs, and then Officer Douds arrived, and held Magyar's head to keep him from thrashing. *Id*. at 303. Officer Womack then arrived and used two or three "knee blasts" on Magyar to get his legs down. *Id*. Womack inflicted these two or three "knee blasts" "without having any idea of why the officers were struggling with Magyar." *Id*. at 309. Douds used two different "pain compliance techniques" on Magyar's back to force Magyar to free his hands for handcuffing, which succeeded. *Id.* at 303. The *Thompson* court observed, "Douds used two 'pain compliance techniques' on Magyar's back without having any idea of why the officers were struggling with Magyar." *Id*. at 309.

At some point after the handcuffing, the officers bound Magyar's legs with rope. *Id*. Even then, several officers continued to physically hold the handcuffed and bound Magyar down on the ground. *Id*. Mazza continued to sit on top of Magyar, and Douds and Drees continued to lie across his shoulders, even after he was secured by handcuffs. *Id*. Magyar went limp, and when the officers turned him over he had abrasions on his face and his nose was bleeding. *Id*. Unfortunately, Magyar stopped breathing, and eventually entered a persistent vegetative state. *Id.*

Magyar's representative brought an action that included a state battery claim against all of the officers individually. *Id*. at 304. They all asserted as an affirmative defense that they were entitled to statutory immunity under § 768.28(9), *Fla. Stat*. *Id*. The trial court granted their motions for summary judgment on this affirmative defense. *Id.* The Second District Court of Appeals reversed, but only on the basis that the trial court erred in granting summary judgment on the third of the three statutory exclusions, the wanton and willful disregard of human rights prong. *Id.* at 308.

The appellate court, like the trial court, applied § 768.28(9)(a), *Fla. Stat*. to determine whether the officers could be individually liable for damages. *Id*. at 309. Under these facts, the

*Thompson* court agreed with the trial court, ruling that the officers acted neither in bad faith nor with a malicious purpose. *Id.*

The court reversed the summary judgment order only as to the wanton and willful disregard of human rights prong of the statute. *Id.* In so doing, the *Thompson* court emphasized that "the level of force applied to Magyar by the officers arriving at the scene in response to backup arguably shows a wanton and willful disregard for human rights." *Id.* For example, Womack inflicted multiple "knee blasts" to Magyar and Douds employed two "pain compliance techniques" to him despite having no idea why he was struggling with the other officers. *Id.* Because Drees told backup officers as they approached that they were not to hurt Magyar because they were only trying to get him to the hospital, the court reasoned, "if the officers heard and ignored Drees' warning, their actions constituted a wanton and willful disregard for human rights." *Id.* In addition, the court found that at least three officers continued to hold Magyar down with their full body weight even after he was handcuffed and bound with ropes also raises the same question as to whether their actions constituted a wanton and willful disregard for human rights. *Id.*

Ultimately, the Court concluded that because the record shows that there are genuine issues of material fact as to whether the officers acted with wanton and willful disregard of Magyar's rights and safety, the trial court's decision to grant summary judgment on the basis of statutory immunity was improper. *Id.* at 310.

Clearly, if the aggravated conduct of the officers in *Thompson* was not sufficient to satisfy the heightened requirements of the "bad faith clause" and "malice clause" of the statute, Deputy Wagner's conduct obviously does not approach this standard. In addition, because Deputy Wagner's conduct is less aggravated than the officers' conduct in *Thompson*, this Court can also find as a matter of law that Wagner's conduct does not satisfy the "wanton and willful clause,"

either. But ultimately, like *Thompson*, because the record shows that there are genuine issues of material fact as to whether Deputy Wagner acted with wanton and willful disregard of Ms. Taylor's rights and safety, summary judgment on the basis of statutory immunity is improper.

Two cases since *Thompson* have made clear that no reasonable jury can find that Wagner's conduct was so aggravated that Plaintiff's battery claim must be asserted against Deputy Wagner, and not against Gualtieri. In *Peterson v. Pollack*, 290 So. 3d 102 (Fla. 4th DCA 2020), a recent case involving claims originating in the Parkland school shooting tragedy, the appellate court addressed the definitions of the three clauses of § 768.28(9)(a), *Fla. Stat*. The *Peterson* court notes that, because the statute does not define the clauses, it must look to pertinent judicial interpretations. *Id*. at 109. First, "bad faith" under the statute equates "'with the actual malice standard.'" *Id., quoting Parker v. State of Florida Bd. of Regents ex rel. Florida State University*, 724 So. 2d 163, 167 (Fla. 1st DCA 1998). Second, according to *Peterson*, "malicious purpose" in the statute "has been interpreted as meaning the conduct was committed with 'ill will, hatred, spite, [or] an evil intent." *Id., quoting Eiras v. Florida Dept. of Business and Professional Regulation*, 239 F. Supp. 3d 1331, 1343 (M.D. Fla. 2017).

Third, according to *Peterson*, "wanton and willful disregard of human rights" has been interpreted as "'conduct much more reprehensible and unacceptable than mere intentional conduct.'" *Id., quoting Richardson v. Pompano Beach*, 511 So. 2d 1121, 1123 (Fla. 4th DCA 1987). It is "'conduct that is worse than gross negligence.'" *Id., quoting Sierra v. Associated Marine Institutes, Inc.*, 850 So. 2d 582, 593 (Fla. 2nd DCA 2003). Noting that this language does not actually define the terms and observing that no prior case has provided a definition, the *Peterson* court looked to additional sources for a "legally acceptable interpretation" of the "wanton and willful clause." *Id*. at 109-110. The *Peterson* court looked for definitions in various standard

Florida jury instructions. *Id.* at 110. The court found a definition of "wanton" as acting "'with a conscious and intentional indifference to consequences and with the knowledge that damage is likely to be done to persons or property," while "willful" means "'intentionally, knowingly, and purposefully." *Id.* (quotations omitted). The *Peterson* court expressly adopted this definition for the wanton and willful clause of the statute. *Id.*

In *Ross v. City of Jacksonville,* the court, pre-*Peterson*, interpreted the "wanton and willful clause" to require proof of conduct that is even more egregious than the high standard for gross negligence. 274 So. 3d at 1183, *citing Elliott v. Dugger*, 579 So. 2d 827, 830 (Fla. 1st DCA 1991). The *Ross* court found that gross negligence is not sufficient, even though "gross negligence is defined as 'that course of conduct which a reasonable and prudent [person] would know would probably and most likely result in injury to persons or property.'" *Id., quoting Carraway v. Revell*, 116 So. 2d 16, 22 (Fla. 1959). In other words, even evidence that an officer's conduct is so aggravated that that a reasonable person in her position knew her conduct would probably and most likely result in injury would not be sufficient to satisfy the "wanton and willful clause."

With these legal standards in mind, it is clear that no reasonable jury can find that Deputy Wagner's conduct during his battery on Ms. Taylor reflected the aggravated states of mind required under the "bad faith," "malice," and "wanton and willful" clauses of § 768.28(9)(a), *Fla. Stat.* Therefore, summary judgment should be denied as to the Sheriff's supplemental state law battery claim.

During the incident, Deputy Wagner was in the course and scope of his employment. (Doc 54-3, 66:2-5) He was employed by the Pinellas County Sheriff's Office, on the DUI unit, wearing the agency uniform, and driving an unmarked Dodge Charger. (Doc 54-3, 22:7-14, 42:10-14)

When Deputy Wagner observed the passenger and driver switch seats, he thought they were trying to evade and obstruct his investigation for driving with a suspended license. (Doc 54-3, 27:22-25, 26:18-21, 27:2-5) It heightened his sense of security that night. (Doc 54-3, 34:12-16)

According to Deputy Wagner, Ms. Taylor was upset that he wouldn't let her take the truck home. (Doc 54-3, 40:15-17) Deputy Wagner's assessment of Ms. Taylor's demeanor when she got out of the vehicle and slammed the door was that she was angry and upset. (Doc 54-3, 43:17-19, 47:7-10) Deputy Wagner was not expecting her to come out of the vehicle that way and was in fear for his own safety at that point. (Doc 54-3, 81:5-10)

Deputy Wagner then felt something on his chest and his perception that night was that Ms. Taylor pushed him. (Doc 54-3, 45-46:19-4) As a result, he was taking her into custody for battery on a law enforcement officer. (Doc 54-3, 48:7-9)

When he spun her around towards the truck, his focus was to get her against the struck and her hands behind her back to handcuff her. (Doc 54-3, 48:3-4, 49:5-7) According to Deputy Wagner, Ms. Taylor used aggressive resistance. (Doc 54-3, 78:10-13) Aggressive resistance includes bracing, tensing, pulling away and trying to get away. (Doc 54-3, 78: 14-20) According to Deputy Wagner, Ms. Taylor continued to try to pull away, so Deputy Wagner used an armbar takedown to direct Ms. Taylor to the ground. (Doc 54-3, 49:19-20) This is a maneuver Deputy Wagner was trained on in defensive tactics. (Doc 54-3, 49:14-23)

Deputy Wagner's plan was to get Ms. Taylor prone on the ground and his perception was that she was offering resistance by trying to get her arms away, spinning around trying to get out of his grip and being resistant to his actions. (Doc 54-3, 50: 13-24)

During the incident, Deputy Wagner's adrenaline was up, he was pumped up and he perceived a push, however upon a later review of the video he learned that was not an accurate

description of what happened that night. (Doc 54-3, 53:12-16) According to Deputy Wagner, to this day he still believes he felt a push or a shove off of his chest and that is why he reacted the way he did. (Doc 54-3, 54: 2-5) He was not attempting to violently take Ms. Taylor down for snatching a license out of his hand. (Doc 54-3, 54:7-12) Instead, he was attempting to use a defensive tactic maneuver to effectuate an arrest for a perceived Batt LEO. (Doc 54-3, 54: 7-12) It is Deputy Wagner's position, if his perception was a reality, that had Ms. Taylor actually shoved him in the chest, the use of force used in the video would have been justified. (Doc 54-3, 62:11-4)

      A reasonable jury could determine that Defendant Wagner overreacted to what he perceived as Plaintiff's push and resistance. An officer is not required to err on the side of caution, before he makes the decision to stop the threat that he perceived. *Marsh v. Butler County, Ala.,* 268 F. 3d 1014, 1032 (11th Cir. 2001).

      While qualified immunity is not at issue in this Motion, an analogy can be drawn with regards to the reasonableness of the use of force. An officer is still entitled to qualified immunity even if he makes a mistake of fact, as long as such mistake was reasonable. *Pearsan v. Callahan,* 555 U.S. 222, 231 (2009) The Eleventh Circuit has found the use of deadly force reasonable where there is a reasonable perception that the suspect poses an imminent threat of danger even if in actuality he does not. *Carr v. Tangelo,* 338 F. 3d 1259 (11th Cir. 2003). In *Carr,* the Court granted qualified immunity to the officer who shot Carr when he mistakenly believed that Carr had pulled a gun on another officer and thought he heard the gun being racked when in actuality only a rock had been thrown and the racking sound had been made by sunglasses. See also *McLenagan v. Karnes,* 27 F. 3d 1002, 1006-1007 (11th Cir. 1994)(holding that it was reasonable for an officer to use excessive force when another officer yelled "he has a gun" and the suspect was almost upon the shooting officer, even though it was later determined that the suspect was unarmed.) See also

*Penley v. Weippert,* 605 F. 3d 843, 851, 854 (11th Cir. 2010)(concluding that no Fourth Amendment violation occurred when the officer believed reasonably that the suspect - who was armed with a realistic-looking toy gun posed a threat of serious physical harm to the officers and nearby students).

Here, a jury could find that Deputy Wagner's perception that Ms. Taylor was reasonable, in light of the facts and circumstances surrounding his contact with Ms. Taylor, and therefore find the use of force by Deputy Wagner as not excessive. The inquiry into the reasonableness of force "must embody allowance for the fact that police officers are often forced to make split-second judgments- in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Graham* at 396-397. The Court must "see the situation through the eyes of the officer on the scene that is hampered by incomplete information and forced to make a split-second decision between action and inaction in circumstances where inaction could prove fatal". *Crosby v Monroe County,* 394 F. 3d I328, 1334 (11 1h Cir. 2004). The only perspective that counts when making the reasonableness determination is that of the reasonable officer at the time the events unfolded. *Jean-Baptiste v. Gutierrez,* 627 F. 3d 8I6, 82I (11th Cir. 2010) See also, *Graham,* 490 U.S. at 396 (explaining that a "standard of reasonableness at the moment applies")

Defendant, Sheriff, places great weight on the fact that Ms. Taylor testified the actions of Deputy Wagner were done in bad faith and with malice. However, Ms. Taylor is not a lawyer, has received no legal training, and does not know the legal definition of bad faith or malice. (Exhibit 1; Affidavit of Paige Taylor, p. 1, para. 4) From a legal aspect, Ms. Taylor cannot opine as to whether the actions of Deputy Wagner were done with bad faith or malice. (Exhibit 1, p. 1, para. 5) Therefore, no credit should be given to her opinion of whether the actions were done in bath

faith or with malice. The assailee's perception of how it felt to be the victim of excessive force is not a determining factor of whether the actions of the Defendant were done with malice or bad faith. Here, the question of whether it was with or without malice is a jury question.

Based on the facts a reasonable jury could conclude the actions of Defendant, Deputy Wagner, were done in the course and scope of his employment with the Pinellas County Sheriff's Office and without malice and therefore hold Defendant, Sheriff Gualtieri liable for battery.

### **STATE LAW FALSE ARREST AGAINST SHERIFF SHOULD NOT BE DISMISSED**

Pursuant to section 768.28(9)(a) of the Florida Statutes state officers, employees and agents are immune from lawsuits arising from "act[s], event[s], or omission[s] of action in the scope of [their] employment or functions." The immunity may be pierced only if state agents either act outside the scope of their employment, or act "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9)(a).

Courts construing the bad faith prong of section 768.28 use the actual malice standard, *Parker v. State Bd. of Regents ex rel. Fla. State Univ.*, 724 So.2d 163, 167 (Fla. 1st DCA 1998), which means the conduct must be committed with "ill will, hatred, spite, [or] an evil intent," *Eiras v. Fla.*, 239 F. Supp. 3d 1331, 1343–45 (M.D. Fla. 2017) quoting *Reed v. State*, 837 So.2d 366, 368–69 (Fla. 2002). Conduct meeting the wanton and willful standard is defined as "worse than gross negligence," *Sierra v. Associated Marine Insts., Inc.*, 850 So.2d 582, 593 (Fla. 2d DCA 2003), and "more reprehensible and unacceptable than mere intentional conduct." *Eiras v. Fla.*, 239 F. Supp. 3d 1331, 1343–45 (M.D. Fla. 2017) citing *Richardson v. City of Pompano Beach*, 511 So.2d 1121, 1123 (Fla. 4th DCA 1987). *See Kastritis v. City of Daytona Beach Shores*, 835 F.Supp.2d 1200, 1225 (M.D. Fla. 2011)

Generally, courts are reluctant to strip officers of their immunity under section 768.28(9)(a) of the Florida Statutes. *Eiras v. Fla.*, 239 F. Supp. 3d 1331, 1343–45 (M.D. Fla. 2017) Additionally, the mere fact that an officer may have acted without probable cause is not enough to pierce the officer's immunity. *Eiras v. Fla.*, 239 F. Supp. 3d 1331, 1343–45 (M.D. Fla. 2017) See *Caldwell v. Nocco*, No. 8:14-cv-2167-T-30AEP, 2015 WL 9302835, at *5 (M.D. Fla. Dec. 22, 2015) (holding an officer immune from a false arrest claim under Florida law because even "[i]n cases in which an officer fails to prove arguable probable cause, he may still be immune from personal liability.").

In *Dunn v. City of Boynton Beach, Fla.*, 192 F.Supp.3d 1310, 1325 (S.D. Fla. Jun. 14, 2016), the court determined that the allegation that an officer acted "in the absence of lawful authority" and "in the absence of reasonable suspicion" of criminal activity did not constitute an allegation that an officer acted in bad faith for purposes of Florida Statute section 768.28(9)(a). According to the court, not "every arrest lacking probable cause is made in bad faith" and "Florida's waiver of sovereign immunity clearly contemplates that an agent can commit a wrongful, and even intentional, act and still lack bad faith." *Id.*

Likewise, in *Fernander v. Bonis*, Florida's Fourth District Court of Appeal affirmed the dismissal of a false imprisonment claim brought under Florida law against a police officer and the city. 947 So.2d 584, 586 (Fla. 4th DCA 2007). The officer arrested the plaintiff for a crime he did not commit. *Id.* A witness identified the plaintiff from a photo-array, but warned the officer that the perpetrator had "a little more weight." *Id.* at 587. According to the court, this allegation did not demonstrate that the officer executed the arrest "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." *Id.* at 589.

Consistent with this authority, it appears that under Florida law, the absence of probable cause standing alone will not deprive an officer of immunity under section 768.28.

In *Navarro v. City of Riviera Beach*, 192 F.Supp.3d 1353, 1363, 1366 (S.D. Fla. 2016), the court found that an assistant state attorney was immune from a Florida false arrest claim despite pursuing a case with knowledge that a detective provided unreliable information. Even where a plaintiff alleged that two police officers "fabricated evidence and concealed exculpatory evidence," the Eleventh Circuit affirmed the dismissal of false arrest claims brought under Florida law. *Gurrera v. Palm Beach Cnty. Sheriff's Office*, 657 Fed.Appx. 886, 892 (11th Cir. 2016). There, the court held that these allegations fell short of actual malice because they did not allege that the officers employed fraudulent or corrupt means to obtain a warrant. *Id.; cf. Lloyd v. Hines,* 474 So.2d 376, 378–79 (Fla 1st DCA 1985) (finding immunity pierced by allegations that two deputy sheriffs used "fraud or other corrupt means" to arrest, imprison and maliciously prosecute the plaintiff). Therefore, pursuit of a criminal charge despite knowledge of potentially exonerating information is insufficient to defeat an officer's statutory immunity.

Here, there is no disputed that Deputy Wagner was within the course and scope of his employment with the Pinellas County Sheriff's Department. At the time of the incident Deputy Wagner was employed by the Pinellas County Sheriff's Office, on the DUI unit, wearing the agency uniform, and driving an unmarked Dodge Charger. (Doc 54-3, 22:7-14, 42:10-14, 66:2-5)

Deputy Wagner was behind the vehicle at a red light and conducted a check of the registration through FCIC and NCIC to see if anything was wrong. (Doc 54-3, 25:2-6) He was advised the registered owner's driver's license was habitually suspended and the tag was not assigned to a specific vehicle. Doc 54-3, 25:17-19) He activated his emergency lights to have the car pull over. (Doc 54-3, 26:5-8) Immediately as the car came to a stop by the gas pump, the

passenger and driver of the vehicle switched seats. (Doc 54-3, 26:18-21, 27:2-5) When Deputy Wagner observed this, he thought they were trying to evade and obstruct his investigation for driving with a suspended license. (Doc 54-3, 27:22-25)

Deputy Wagner arrested the driver for DWLS Habitual Offender. (Doc 54-3, 35:12-14) After placing the driver under arrest, Deputy Wagner testified that he could have charged Ms. Taylor with obstruction for switching seats but was going to give her a break. (Doc 54-3, 36:5-12)

Deputy Wagner asserts he did not intentionally misstate the facts when he wrote his police report. (Doc 54-3, 66:6-8) Defendant Wagner arrested Plaintiff for "battery on a law enforcement officer" and "resisting an officer with violence." (Doc 61, p. 3 para. 19)  This arrest was based on Deputy Wagner's perception that night, Ms. Taylor pushed him, and that would provide the valid legal basis to arrest her for battery on a law enforcement officer. (Doc 54-3, 48:7-9)The basis for the resisting with violence charge encompassed the entire incident, including the resistance that occurred after Deputy Wagner grabbed her, put her against the truck and then on the ground. (Doc 54-3, 73:13-23)

While ultimately the charges were dropped because the State could not prove that Ms. Taylor in fact pushed Deputy Wagner, that does not negate the fact that Deputy Wagner perceived the push and therefore had a colorable basis to make the arrest. (Doc 61, p. 3, para. 20-21) Even if arguable probable cause did not exist for the arrest, there is no evidence that Deputy Wagner arrested Ms. Taylor with "ill will, hatred, spite, [or] an evil intent," or that his actions were "worse than gross negligence," or were "more reprehensible and unacceptable than mere intentional conduct."

While Defendant, Sheriff, would like to rely on Deputy Wagner's post arrest actions, reports and statements, to prove bad faith or malice, those facts are irrelevant. At that point, Ms.

Taylor has already been arrested and the violation has already occurred. Courts must approach the analysis from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight. *Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014).

Based on the facts a reasonable jury could conclude the actions of Defendant, Deputy Wagner, were done in the course and scope of his employment with the Pinellas County Sheriff's Office and without malice or bad faith and therefore hold Defendant, Sheriff Gualtieri liable for Ms. Taylor's false arrest.

## IV. CONCLUSION

Based on the aforementioned reasons, the Court should deny Defendant, Sheriff Gualtieri's, Motion for Summary Judgment.

**Respectfully submitted,**

**MICHAEL P. MADDUX, P.A.**

*s/ Michael P. Maddux*
Michael P. Maddux, Esquire
Florida Bar Number: 964212
Trial Counsel for Plaintiff
2102 West Cleveland Street
Tampa, Florida 33606
Telephone: (813) 253-3363
Facsimile: (813) 253-2553
E-Mail: mmaddux@madduxattorneys.com
jsalter@madduxattorneys.com
ctonski@madduxattorneys.com

## CERTIFICATE OF SERVICE

**I HEREBY** certify that on this 4th day of June, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice of electronic filing to Jason Gordillo, Esq and Richard Smith, Esq.

**MICHAEL P. MADDUX, P.A.**

*s/Michael P. Maddux*
Michael P. Maddux, Esquire